OPINION OF THE COURT
Nat H. Hentel, J.
After nonjury trial, judgment for defendant; plaintiff’s cause of action dismissed for failure to prove defendant’s alleged breach of contract by a fair preponderance of the credible evidence.
The facts simply are that an agreement for installation and rental of certain specified burglar alarm equipment was signed by plaintiff and defendant on April 29,1980. Paragraph 2 of the said agreement calls for defendant to pay an $80 installation fee, plus installments of $35 per month, or a total of $420 for “each year of the term * * * as rent for the use of said electrical protection apparatus.”
The dollar amounts, and the monthly installments filled-in spaces are occupied by handwritten letters in ink much larger than the surrounding printed agreement terms, and are easily legible. Then, in ultra fine print, the agreement states in paragraph 2 following the filled-in blanks that such monthly or annual payments are “terminable on the fifth anniversary of the *38 effective date this system is operative.” (Parenthetically, the proof at trial fails to establish the effective operational date of the system.)
Buried in the same size ultra fine print of paragraph 3 of the agreement is the clause: “In the event of a default in the payment of the above mentioned installments * * * the entire balance for the entire term herein shall immediately become due and payable and the subscriber shall be liable therefor”. This paragraph is usually know as an “acceleration clause”.
The court in inspecting the agreement finds that the filled-in notations in the blank spaces provided on the front page of the two-page contract were quite prominent as compared to the almost illegible and very small fine print in which the “five-year term” of the agreement was printed. That provision blended together with all the other fine print so that the eye could not easily, without repetitive effort or patience, identify that particular, substantial, and vital element of the agreement. When the court now looks at the agreement it notes that the eye is first led to the written fill-ins, but the “five-year term” of the agreement, not being treated in the same manner as the fill-ins, becomes a hidden trap for the unwary customer. Such customer, as a result, could easily be taken advantage of by the “contractor” who is in a superior bargaining position by virtue of his knowledge of the contents of his agreement (see State of New York v Avco Fin. Serv., 50 NY2d 383, 389).
After the date-unspecified installation of the equipment, defendant paid all monthly installments through August 31,1981. Prior to August, 1981, defendant, the operator of a boutique in a building wherein she was a tenant, was required by court order to vacate the premises on or before August 31, 1981, since the owner was intent upon demolishing the building.
Defendant’s then attorney advised plaintiff in writing by letter dated August 28, 1981, of the tenant’s imminently required vacating of the premises, and further advised plaintiff to remove its rented equipment which plaintiff accomplished on the evening of August 31,1981. Thereafter, without even billing or otherwise making demand in writing of defendant for any monthly rental amounts allegedly due on and after September 1, 1981, or for any claimed accelerated amount for a balance due under the alleged “five-year term”, plaintiff commenced this suit without further ado against defendant for 44 months’ rent at $35 per month, or $1,540, plus New York City sales tax of $123.20, for a total of $1,663.20. Plaintiff’s summons and complaint were dated September 22, 1981.
*39 As the sole trier of the facts in this case, the court gives credence to defendant’s testimony. Defendant is an oriental woman obviously not born in this country, who has difficulty in speaking the English language, and who testified that she cannot read English even if it is in large type; and that she did not, nor could she read the 22 paragraphs of finely printed clauses, contained in the two-page agreement much of which printed material appeared on the back of the agreement. This court confesses that it also finds it most difficult to read. (See CPLR 4544; General Obligations Law, § 5-702.)
With respect to the execution of the contract, defendant stated: “The vice-president of plaintiff’s corporation approached me and suggested the installation of burglar alarm equipment in my store because of the high incidence of burglaries in my neighborhood.” She advised him that “my building was going to come-down and I would have to move.” The vice-president, a son of plaintiff’s president and owner, however, told her “not to worry, that maybe the building would not come down for 5 or 10 years, and that the system could be installed at $35 per month until defendant moved.” Defendant testified that “I trusted the vice-president, and I was never told that the agreement was for a five-year period”, or, as the court has indicated, was this provision readily revealed by the fine print in which it was buried. She thought that the agreement was “for a monthly rental, and the equipment would be removed by plaintiff” when she was required to move her business.
From this state of facts it would appear at first blush that the lease agreement containing the acceleration clause is an enforceable contract. “[Such] clauses are quite common and are generally enforced according to their terms” (Key Int. Mfg. v Stillman, 103 AD2d 475; see Fifty States Mgt. Corp. v Pioneer Auto Parks, 46 NY2d 573). See opinion of Judge Seymour Lakritz in Royal Burglar & Fire Alarm v Chips Center (Civil Ct of City of NY, Queens County, June 8, 1979, affd App Term, 11th Judicial Dist) in which Judge Lakritz held: “Parties to a contract have the right to agree to such clauses, provided that the clause is neither unconscionable nor contrary to public policy. Mosler Safe Co. v. Maiden Lane Safe Deposit Co., 199 N.Y. 479; Truck Rent-A-Center v. Puritan Farms, 2nd, Inc., 41 N.Y.2d 420”.
See, also, Fifty States Mgt. Corp. v Pioneer Auto Parks (46 NY2d 573, supra) and also Chemical Bank v Queen Wire & Nail (75 AD2d 999, 1000), wherein it was held: “Absent a claim of fraud or exploitive overreaching on the part of the plaintiff in compelling performance of its bargained right, the agreement of the parties must be enforced in accordance with its terms”.
*40 However, when we consider the surrounding circumstances under which the contract was signed, is a different duty imposed upon the court in enforcing the acceleration clause?
(a) Defendant’s business was located in plaintiff’s territory serviced by a vice-president, the son of the plaintiff corporation’s owner and president.
(b) The discussion concerning the installation of a burglar alarm system was initiated by plaintiff and not by defendant.
(c) Plaintiff’s president who testified at the trial is an educated and articulate person, obviously well-versed in the English language. The court assumes (“like father like son”) that the vice-president who sold defendant on installing a burglar alarm system is also articulate and at ease in the English language.
(d) Defendant, a business woman of oriental extraction not born in this country, speaks English with difficulty and does not read the English language at all.
(e) The written agreement prepared by plaintiff was not shown or given to defendant in advance of its execution for her perusal or inspection. The “five-year term” and the acceleration clause were buried in a plethora of “legalese” language in such small print that it really requires magnification to read.
(f) Knowing full well that defendant would be required to move her business shortly, a circumstance beyond her control, nevertheless, defendant’s vice-president told her “not to worry about any other contractual obligation if that event occurred.”
(g) Plaintiff testified that the sale of the equipment when it was installed in defendant’s store in or about April, 1980, was $414; and that this equipment was completely salvaged it being in good condition when it was removed from defendant’s store; and that such equipment was installed and used in other jobs within six months of its removal from defendant’s store on August 31, 1981.
Section 2-302 of the Uniform Commercial Code (unconscionable contract or clause) provides: “(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.”
The “Practice Commentary” anent, subdivision (1) of section 2-302 of the Uniform Commercial Code, further indicates that *41 “unconscionability is not a jury question but a question of law to be determined by the court alone.” (See Buerger & O’Connor, McKinney’s Cons Laws of NY, Book 62½, Uniform Commercial Code, pp 192-193; emphasis added.) And, it is recalled that “ ‘[e]very contract implies good faith and fair dealing between the parties’ ” (O’Neil Supply Co. v Petroleum Heat & Power Co., 280 NY 50, 54).
However, as Judge Fuchsberg wrote in Matter of State of New York v Avco Fin. Serv. (50 NY2d 383, 389): “As a general proposition, unconscionability, a flexible doctrine with roots in equity * * * requires some showing of ‘an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party’ * * * The concept * * * is not aimed at ‘disturbance of allocation of risks because of superior bargaining power’ but, instead, at ‘the prevention of oppression and unfair surprise’ ” (emphasis added).
Further, Judge Fuchsberg indicated (supra, at p 390), that “deception * * * as to [a] clause’s content or existence * * * or the presence of language difficulties or illiteracy affecting its execution, or any other reasons that would have made it unlikely that consent was freely and knowingly given [are factors within] the embrace of what is * * * referred to as ‘procedural unconscionability’ ” (emphasis added). Defendant has demonstrated by her proof at the trial that the not easily ascertainable finely printed clauses anent “five-year term” and “acceleration” misled her as to the type of contract she signed, and thus to enforce such contract would be unconscionable and an affront to this court’s sense of justice.
Clearly, in this case, the execution of the printed form agreement could not qualify as a contract entered into between two “sophisticated businessmen or entrepreneurs”. Defendant, not able to communicate well, relied on plaintiff vice-president’s “not to worry” representations which misled her into signing an agreement which defendant mistakenly thought would have no further consequence or responsibility for her after she would vacate her leased business premises. This is one of these “ ‘rare cases’ [where the acceleration] clause will be denied enforcement under equitable principles” (cf. Key Int. Mfg. v Stillman, 103 AD2d 475, supra).
Defendant entered into the contract without having read or having understood its contents. The crucial “five-year term” of the agreement and the “acceleration clause” were not specifically pointed out to her. The court finds that there could not have been a meeting of the minds of the parties with respect to *42 the crucial terms of the agreement. Thus, the mistake of the defendant, and the misrepresentation of the plaintiff do not spell out an enforceable contract but one that is unenforceable because of unconscionability as a matter of law. The defendant should be relieved of any further obligation under the contract.
Finally, it should be noted that plaintiff never produced its vice-president and defendant’s sales representative contact to testify in support of plaintiff’s position, or to controvert defendant’s testimony at the trial; nor was. any proof offered by plaintiff as to the whereabouts, health or accessibility of its vice-president. Thus, the court, as trier of the facts, is entitled to assume that the vice-president was indeed in a position to give relevant evidence with respect to defendant’s defense testimony, and since there was no explanation for failing to call him as a witness, the court is now entitled to infer that had the vice-president been called, his testimony would not contradict defendant’s version, or would not support plaintiff’s version of the execution of the alleged agreement between the parties. The court, therefore may draw, and the court does draw the strongest inferences against plaintiff which the opposing evidence permits. (NY PJI 1:75, missing witness charge.)
Accordingly, judgment for defendant, and plaintiff’s complaint is dismissed.